IN THE UNITED STATES DISTRICT COURT
DISTRICT OF VIRGINIA
EASTERN DIVISION

UNITED STATES OF AMERICA

                    CASE NO.  1:11-cr-00084-LMB

vs.

DESIREE BROWN

_____

## DEFENDANT'S SENTENCING MEMORANDUM

## 5K1.1: Substantial Assistance

Substantial assistance can involve a broad spectrum of conduct *that must be evaluated by the Court on an individual basis.*[1]  A proper exercise of the Court's discretion under **§5K1.1,** therefore, involves an individualized qualitative examination of the incidents of the defendant's cooperation.[2]

---

[1] See, **Application Note to U.S.S.G. §5k1.1.**

[2] See, **U.S. v. King**, 53 F.3d 589,590-92 [3rd Cir. 1995][remanded: it was not clear whether Circuit Court properly evaluated defendant's assistance or merely departed 3 levels because that was its "practice" in §5K1.1 cases. In accord, **U.S. v. Johnson**, 33 F.3d 8,10 [5th Cir. 1994] [remanded: under §5K1.1 "Court is charged with conducting a judicial inquiry into each individual case before independently determining the propriety and extent of any departure in the imposition of a sentence".

1

Therefore, with these requirements in mind, Desiree Brown, respectfully requests that the Court consider the following narrative relating to the substantial assistance that she provided to the government prior to and during the course of its prosecution and trial related efforts concerning other persons charged, herein, namely, to wit:

## OVERVIEW[3]

**8/3/09:** Peter Emerzian and Nancy O'Shea introduced themselves to Desiree Brown and indicated that she was a person of interest in their on-going investigation.  They afforded her an opportunity to cooperate relating to TBW.  Ms. Brown agreed to do so and began answering questions.  The focus of the initial inquiry addressed how funds were diverted to cover "cash shortfalls".  At that time, the agents were provided an explanation and additional information which they apparently were not aware of concerning Taylor Bean & Whitaker's relationship with Colonial Bank.

---

[3] Information is taken from the diary journal of Desiree Brown memorializing her efforts on behalf of the government and discussions relating to same with her counsel and related notes, thereon. It should be further noted that these are **"highlights"** of the cooperation provided to the government.  These are to be regarded in addition to, and not in lieu of, the defendant's additional efforts.

**Several hours later**, Ms. Brown received a "PIN" from Donna Skuhrovec, making some inquiries.  After speaking with the agents, Ms. Brown provided the appropriate responses at the request of the agents.  At the agents' requests, Ms. Brown made efforts to obtain other PIN numbers and provide them to the agents at that time.  A short time thereafter, Ms. Brown was advised by the agents that the FBI was serving a warrant on Colonial and TBW.

Ms. Brown received a PIN from Lee Farkas advising her "that she was under no obligation to speak to the FBI and to advise them accordingly".  This information was shared with the agents. Ms. Brown was continuously debriefed and was informed on how to respond to Mr. Farkas' inquiries.  Follow-up PINS from Lee Farkas were forwarded to Peter Emerzian.

As the day progressed, contacts were made, back and forth, relating to PIN's from Lee Farkas and others.  As the late afternoon and early evenings progressed, Ms. Brown, under the instructions of the agents, was continuing on-going communication with Lee Farkas.  At approximately 8:00 p.m., the agents assisted Ms. Brown to place a call to Lee Farkas which was <u>recorded</u>.  Ms. Brown was not comfortable returning to her home that evening and

**spent the night** at a motel not far from where the agents were staying.

**8/ 4/09:** At about 7:50 a.m., Agent Emerzian contacted Ms. Brown and wished to establish a second interaction with Lee Farkas. There was a mention about wearing a <u>recording device</u> on her person.  Part of the remaining morning was spent making efforts to contact and PIN Lee Farkas under the tutelage of the agents.

Agent O'Shea contacted Ms. Brown at approximately 11:30 a.m. in order to coordinate follow-up telephone activity with Lee Farkas.  A <u>recorded</u> phone call was made to Mr. Farkas.

At this point, Ms. Brown was advised by the agents that she should locate an attorney with extensive federal court experience who would assist her with this and also buffer her from TBW counsel since "the rules would change significantly from this point on".  Ms. Brown hired Jack R. Maro, undersigned counsel, to represent her interests, herein.

**8/ 5/09 - 3:43 p.m.:** Agent O'Shea contacted Ms. Brown, after obtaining permission from her attorney to do so.  Ms. Brown advised Agent O'Shea that she had been contacted by Donna Skuhrovec and was informed that she could come to work.  The agents advised her that she now need not do anything that she did not want to do and that they [agents] would discuss the matter further since Ms. Brown apparently was concerned for her <u>personal safety</u> by returning to the corporate offices.  Later that

evening, the agents contacted Ms. Brown and indicated that they were trying to work on how to protect her if she chose to go back to TBW.

**8/ 6/09 - 9:46 a.m.:** Agents contacted Ms. Brown and once again made inquiry as to whether or not she wished to return to TBW. At that time, she was also debriefed on information relating to Platinum Bank.  Ms. Brown advised that there was the funding of TBW loans through Platinum Bank without OTS approval.  She believed that there was approximately two million in escrow funds that had been transferred from Colonial Bank escrow accounts to Platinum Bank escrow accounts and 20 million in cash.  This was to support the funding transactions.  This information appeared to be well received by the agents, who made follow-up inquiries. The agents were advised as to the overall operation in detail and also that Paul Allen had something to do with PCB and that Will Leaming, Lee Farkas and Ray Quinlan had recently been hired to "run the bank".

**8/ 6/09 - 4:30 p.m.:** Agent Emerzian contacted Ms. Brown and reviewed the notes that he and Agent O'Shea had taken during their extensive encounters.  As the notes were read over the telephone, Ms. Brown provided clarifications, corrections and extended explanation and at times, additional details, to assist and answer the questions the agents may have developed.

**8/10/09 - 2:59 p.m.:** Agent O'Shea contacted Ms. Brown and made inquiry as to additional questions and answers and requested clarifications relating to interview statements.

**8/23/09 - 7:00 a.m. to 8:30 a.m.:** Traveled from **Ocala**, Florida **to Orlando** for an interview that commenced at **9:30 a.m.** and ended at **2:00 p.m.** Representatives from agencies SEC, HUD, FBI, Treasury, Justice Department and others were present.

The extensive debriefing addressed questions relating to the capital investment for Colonial acquisition, where the money came from; the "hole", how funds were diverted. Explanations were provided that concerning Ms. Brown's understanding of these issues and also the information provided to her by Lee Farkas, such as FNMA shutdown in 2002, pair offs, working capital needs, servicing advances, etc. Recapitulations of various weekend meetings and dates that they occurred with Lee Farkas and others explaining efforts to fix the "hole" at Colonial were developed. Additional information about construction to perm loans that possibly had been "fixed" by copying and pasting, as well as finances and bonuses were also discussed.

Ms. Brown explained and developed the understanding of how Paul Allen, Delton DeArmas, Sean Ragland, Jeremy Collett, Lee Farkas, were involved in the Ocala funding line, its history and how it ended up a "mess".

She also addressed questions relating to loan level information to attempt reconciliation with Colonial on AOT. Information came from Brian Callahan, put on various personal flash drives and given to Lee Farkas to take to Teresa Kelly in Orlando.

Additional names were given of persons involved in the discussions with Farkas. Mike Wawrzyniak was discussed on how efforts were made to fill the "hole" at Colonial Bank. Extended additional financial questions were asked and answered and areas of concern developed. It was apparent that many of the persons attending the meeting were unaware or unclear of "how things went" predicated upon the nature of the questions that were asked.

Additional areas were developed such as cash distributions from TBW. Vacations, bonuses, excursions, gifts, etc.

**8/26/09:** Conversation with Agent O'Shea referencing Sean Ragland; Jeremy Collett and Lee Farkas concerning the "inner circle.

Ms. Brown contacted Agent O'Shea and provided her a phone number for Sean Ragland along with an address which the agents did not have.

**9/ 3/09:** Ms. Brown spoke with agents regarding phone wire transfers from OF collateral to PCB escrow account at the end of March and beginning of April for a total of $50 million dollars. Additional follow-up questions relating to wire transfers from

PCB escrow account to TBW on 7/28/09 for approximately $3.6 million dollars.

Later on that day, additional contact with the agents regarding $20 million and $3.6 million dollar wire transfers; Colonial Bank acquisition; investors and address possible other issues: State Street/Second Street.

**11/18/09 - 7:00 a.m. to 8:30 a.m.:** Traveled from **Ocala to Orlando** to attend another debriefing. **Debriefing commenced at 9:00 a.m. and ended at 6:30 p.m.** Patrick Stokes, Peter Emerzian, Nancy O'Shea, Aaron Lipson, and others, approximately 9 people in total were present.

A representative from SEC was present and reviewed various documentation. Additionally, Agent O'Shea indicated that she was confused after looking at emails and documents prior to the meeting or at some point during the day. Explanations were provided to her to help clarify and provide appropriate direction on how the *various* scenarios, previously provided, actually worked. Primary topics were TBW and Colonial Bank relationships and procedures.

**11/18/09 - 6:35 p.m. to 8:00 p.m.:** Traveled from **Orlando to Ocala.**

**11/19/09 - 6:00 a.m. to 7:30 a.m.:** Traveled from **Ocala to Orlando** for a follow-up meeting with the aforementioned personnel. The meeting started at **8:00 a.m.** and terminated at **1:30 p.m.** The

discussions continued regarding the previous day agenda and carried into Ocala funding.  Once again, various scenarios were visited.  Once again, in-depth explanation of payroll, capital lines, mandatory repurchases, margin calls, pair offs, etc., were provided and questions answered relating to and clarifications associated, therewith.

Developed "project squirrel" information which was clearly not known to any of the attendees.  It was an accumulation of cash to fund Colonial Bank acquisition.

Certain documentation was clarified.  A work sheet submitted by the FBI as a "pipeline" report was not what it purported to be.  Ms. Brown informed him that he could not utilize that to find the information that he was looking for. That he should be able to locate it in the Colonial Bank data or by following a link/file path sent via email daily at TBW to a specific distribution route.  The email should be in the in-box, if not removed.

Specific questions were asked concerning knowledge of various individuals as to what they knew or didn't know, to which Ms. Brown specifically addressed: Sean Ragland; Delton; Brian Callahan; Mike Wawrzyniak.

The issue of Plan B was discussed in-depth and explained. Also, the involvement of Lee Farkas in all of the discussions which included:

Plan B; Project Squirrel; AOT Recycle; Working Capital; Wire Breakdowns; Cash diversion; OF collateral and Borrowing Base; Press Release regarding Colonial Bank deal were extensively explained.

Ms. Brown obtained two days of personal leave from work to attend the Washington meetings on:

**5/ 4/10 - 11:00 a.m. to 5:00 p.m.: Traveled** from **Ocala to Washington, D.C.,** for a meeting on **5/ 5/10**. Spent the night.

**5/ 5/10:** Meeting commencing at **9:00 a.m**. and terminating at **5:45 p.m.**, wherein, Patrick Stokes, Nancy  0'Shea and approximately **8** other persons, one of which was via conference call, were in attendance.

The areas of discussion were emails; tracking of specific transactions and identifying suspect transactions; explaining as to what additional documentation would be needed in order to support the specific transactions or the actual tracking and identification of source funds.

Specifically answered questions and explained capital investment for Colonial acquisition, source of money from the "hole", how funds were diverted.  Discussed salary and bonuses, discussed executive pay and bonuses.

Ms. Brown was put under "pressure" by the panel in an effort to ascertain her credibility and performance under pressure.

**5/5/10 - 5:45 p.m. to 12:30 a.m.: Traveled** from **Washington, DC**

10

back **to Ocala,** arriving back at home at **3:00 a.m.**

**6/10/11:** Signed consent SEC form.

**2/14/11:** Reviewed on numerous occasions, statement of facts concerning plea agreement for correctness, reviewing corrections, additions and omissions.

**2/15/11:** Received over-nighted plea agreement from attorney requesting that it be executed and forwarded to local counsel for execution and filing with the court.

Replacement plea agreement received due to "destruction" of the initial fed ex package.

Contact with Patrick Stokes relating to travel arrangements, plea hearing, trial prep, plan for the week of 2/21/11. Additional clarification of certain questions concerning OF and persons involved in daily and monthly operation and reporting.

**2/22/11: Traveled** from **Hernando to Orlando airport** to travel to **Alexandria, Virginia,** relating change of plea on 2/23/11 which subsequently became changed to 2/24/11.

**2/23/11 - 8:30 a.m. to approx. 7:30 p.m.: In Washington.** Met with Patrick Stokes, Nancy O'Shea and Scott [FBI agent] for trial prep.

**2/24/11: 8:45 a.m. - 9:05 a.m.:** Met with Patrick Stokes for trial prep.

**9:15 a.m. - 1:00 p.m.:** Change of Plea hearing. Met with pretrial services; met with probation office; met with Marshal's office

11

for booking and processing.

**1:00 p.m. - 6:00 p.m.:** Met with Patrick Stokes, Nancy O'Shea and Scott and another female agent to continue with trial prep.

After **6:00 p.m.**, **traveled** to **Reagan National Airport, Washington,** to return to **Orlando.**  Arrived back in Orlando approximately **9:30 p.m.  Drove** back to **Hernando** and arrived home at approximately **12:30 a.m.** the **next day.**

**3/14/11: 4:00 a.m.: Traveled** from **Hernando** to **Orlando** airport to catch flight to **Alexandria.**  Arrived approximately **9:30 a.m.** at Reagan National Airport.  Took taxi to US Attorney's Office.

From approximately **10:30 a.m.** to **5:00 p.m.**, met with Patrick Stokes, Nancy O'Shea and Kerry for trial prep.  Reviewed emails [see pg. 16] and attachments, answered questions.

**3/15/11: 9:00 a.m. to 6:00 p.m.:** Met with Patrick Stokes, Nancy O'Shea and Kerry for trial prep.  Reviewed emails and attachments, answered questions from Patrick Stokes in preparing for trial.  Discussions of staying another night to continue trial prep, but she was allowed to go home since she was not feeling well.  She was advised to visit a doctor when returning home and did so. [It was determined that Ms. Brown was suffering from vertigo].

Ms. Brown was advised that she would be needed back on **3/26/11** and **3/27/11.**  She scheduled her work and related activity around those dates and set this aside for travel.

**3/25/11:** Was notified that the trip for 3/26/11 and 3/27/11 were cancelled.

**3/30/11:** Received itineraries for travel to Alexandria on 4/ 1/11 and 4/ 8/11.

**4/ 1/11: Traveled** leaving at **3:00 a.m.** for International Airport for **7:20 a.m.** flight which **arrived** in **Washington** at **9:15 a.m.** A taxi was taken directly to USAO. At **9:50 a.m.**, Ms. Brown met with Patrick Stokes and Nancy O'Shea until approximately **4:30 p.m.** During the meeting, documents were reviewed, scrutinized, assorted, explained and a spread sheet was further evaluated. Additionally, transcripts relating to two monitored phone calls between Ms. Brown and Lee Farkas [8/ 3/09 & 8/ 4/09] were reviewed.

**4/ 2/11:** On call all day until released. **Traveled:** returned to **Orlando** arriving at **7:30 p.m.** Traveled home in **Hernando** at **10:15 p.m.**

**4/ 8/11: Traveled** from **Hernando** at **6:30 a.m.** and drove to **Orlando** airport. Travel: departed on the **10:20 a.m.** flight and landed at Reagan National at **12:45 p.m.** Met with Patrick Stokes, Kerry and others concerning a review of emails; taped conversations; associated transcripts and additional preparation questions for Ms. Brown as a witness. This continued to approximately **6:00 p.m.**

**4/ 9/11:** Ms. Brown met with Kerry and Patrick Stokes and was continued to be prepared as a witness reviewing various exhibits and answering questions relating to those exhibits for commencement of the trial.  At **1:30 p.m.,** a break was taken until **2:30 p.m**.  At **2:30 p.m**. until **7:00 p.m**. that evening, additional items were reviewed and documents were requested for clarification.

**4/10/11:** Ms. Brown met with Patrick Stokes and Nancy O'Shea from **11:30 a.m**. to **2:30 p.m**.  Mock direct and cross-examination for trial prep.

**4/11/11:** From **7:15 p.m.,** continuation of trial prep, exhibits and sample questions until approximately **10:30 p.m**.

**4/12/11:** Arrived at the courthouse.  Waited and then was summoned as a witness at sometime around **2:45 p.m**. and remained on the witness stand until about **5:30 p.m**. with instructions to report back at **9:30 a.m**. to continue testifying.

**4/13/11:** Continued testimony at **9:30 a.m**. to approximately **11:00 a.m**.  Subsequently left the courthouse and returned to the **Orlando Airport** - **[traveled]** arriving later on that afternoon.

**4/19/11:** Received a telephone call from Nancy O'Shea informing Ms. Brown that Mr. Farkas had been found guilty on all four charges.  Ms. Brown was advised that she had been a good witness and did well on cross-examination.  She was also told that the

jury had been very attentive to her testimony, throughout, and that her efforts were pertinent in assisting the jury to find *Lee Farkas* guilty.

**Summary**:

Desiree Brown played an important role in the early stages of the government's investigation into TBW.  Her information, such as "Project Squirrel" provided substantial insight and her explanation**[s]** of documentation allowed the government to make the appropriate nexus concerning **"Plan B"** in conjunction with **TBW** and **Colonial Bank**.  Also, collateral activity concerning **Ocala Funding** and **Platinum Bank** were brought to light allowing the government to further its investigation. Without Ms. Brown's efforts, the governments efforts would have been readily thwarted and may not have been able to be fully and timely

developed.  Certainly, her efforts expedited and reduced the government's time and costs into the investigation.

Ms. Brown's involvement would have also encouraged other co-defendants to "come aboard" and assist the government.  Catherine Kissick became cooperative only after Desiree Brown's cooperation was initiated.  Ms. Brown's information to the government may have allowed for a timely

15

prosecution of other co-defendants and/or encouraged their timely cooperation.

Ms. Brown's efforts with the government in coordinating, explaining and providing insight, not to mention the review of thousands of emails over a two [2] day period **[1/13/11 9:00 a.m. to 5:00 p.m.; 1/14/11 9:00 a.m. to 4:30 p.m.]** in her attorney's office reviewing boxes of documentation [emails] forwarded by the government prior to her travel for trial preparation.  This was in addition to the thousands of documents that she was questioned about and also had to assist in reconciling.

Her trial testimony "tied together" the testimony of other government witnesses and further explained to the jury how the transactions were inter-connected and related to the issues developed by the government.

Even though, by its plain language, **§5K1.1** applies only to assistance provided in the investigation or prosecution of another, there may be other considerations that can be afforded a defendant relating to departures:

**§5K2.0 Considerations**:

The §5K2.0 requirement for factors <u>not</u> <u>adequately</u> considered by the commission does not apply to

departures under §5K1.1 and "the limitations on the variety of considerations that a court may consider in withholding or curtailing a substantial assistance departure are not merely so stringent as those which pertain when a court in fact departs."[4]

The Court in **U.S. v. Garcia**, 926 F.2d 125 [2[nd] Cir. 1991] stated: "as written, **§5K1.1** focuses on assistance that a defendant provides to the government, rather than to the judicial system"; affirming downward departure absent government motion for defendant whose cooperation with authorities "broke the log jam in a multi-defendant case" and thereby helped the district court's "seriously over-clogged docket", thus providing assistance to the judicial system beyond that contemplated in **§3E1.1** or **§5K1.1.** Accord, **U.S. v. Dethlefs**,_123 F.3d 39,44-45 [1[st] Cir. 1997] [remanded: although facts of case did not support departure, "post **Koon**, it would be folly to conclude that a timely guilty plea which conserves judicial resources and thereby facilitates the administration of justice must not

---

[4] **U.S. v. Marianno**, 983 F.2d 1150,1154-57 [1[st] Cir. 1993][remanded: district court improperly used more restrictive standard governing §5K2.0 departure in refusing to depart after government's 5K.1 motion].

be considered under any circumstances in the departure calculus"].[5]

Although this circuit may not be in accord, see *U.S. v. Dorsey*, 61 F.3d 260,262-263 [4th Cir. 1995], it would be remiss not to consider the various circuit interpretations that have been associated with the evaluations of *Koon*, 116 S.Ct. 2035 [1996], and especially now in the post *Booker Era*.

The Ninth Circuit later reaffirmed the principal of a departure for "a combination of factors that do not individually justify departure."  See, *Koon*, 34 F.3d 1416 [9th Cir. 1994]. The premise that "unless the sentencing commission explicitly prohibited, any factor may be considered as a potential basis for departure."  However, post *Booker*, wherein the sentencing guidelines became a bright line reference manual, a federal court's examination of whether a factor can be an appropriate basis for departure is limited to determining whether the

---

[5] See also, *U.S. v. Khan*, 920 F.2d 1100,1106-1107 [2nd Cir. 1990] [while "theoretically possible" to depart under §5K2.0 for substantial assistance absent a §5K1.1 motion, the sentence considered a situation where defendant cooperates, "only exception" is where defendant shows "evidence of assistance" which would not be used by the government to prosecute other persons . . . but which could be construed as a 'mitigating circumstance'"].  Cf. *U.S. v. Kay,* 140 F.3d 86,88-89 [2d Cir. 1998][remanded: assistance to State or local authorities is outside scope of §5K1.1 and may be considered for departure under §5K2.0].

commission has proscribed, as a categorical matter, consideration of the factor.  If the answer to the question is no - as it will be most of the time - the sentencing court must determine whether the factor, as occurring in the particular circumstance, takes the case outside the heartland of the applicable guideline" which would follow the **Booker** rationale. Although **Koon**, as well as this circuit's ruling in **Rybicki**, 96 F.3d 754,757-59 [4th Cir. 1996] [applying **Koon** analysis in rejecting departure based on the confluence of six factors], may readily be revisited by the amendment as referenced in 5K2.0[B].

## Assistance Outside Scope of §5K.1

Although this court may not specifically apply the actions of Desiree Brown in her willingness to minimize the "make work" for the government, is not something that can be readily ignored by counsel in presenting defendant's "best foot forward" in an effort to mitigate the defendant's *persona* before the court.

Ms. Brown did in fact assist the judicial system and any related docket, thereon, by entering into a consent agreement and also cooperating with a *different* government agency, Securities & Exchange Commission, in an uncoerced manner.  Ms. Brown subsequently entered into a Consent Order[6], which readily demonstrated, not only, an acceptance of her responsibility

---

[6] Civil Action File No. 1:11cv192 [GBL/TRJ]

outside the specifically associated criminal charges, herein, but also extended her clear sense of acceptance of responsibility and overall remorse.  Additionally, Ms. Brown allowed the government to proceed on a criminal complaint, as compared to the formal and time consuming process of obtaining an indictment.

It should be noted that the **Presentence Investigation Report [PSR]** clearly demonstrates that the defendant "admitted her guilt before the Court and was extremely cooperative with the probation office during the preparation of the PSR.  During the interview with the undersigned, the defendant expressed deep regret and remorse for her actions."  See **PSR Pg.15 para. 47.**

**Extreme Remorsefulness:**

A downward departure may be warranted when the sentencing to a statutory maximum under §5G1.1[a] would effectively negate a 3 level reduction for acceptance of responsibility.  See, ***U.S. v. Rodriguez***, 64 F.3d 638,642-43 [11th Cir. 1995].

Two circuits have found that extreme or exceptional remorse may warrant departure even though remorse is considered under §3E1.1.  See, ***U.S. v. Fagan***, 162 F.3d 1280,1284-85 [10th Cir. 1998][remanded: an accounted for factor such as remorse can still be "a permissible factor for departure if it is present to some exceptional degree"; ***U.S. v. Jaroszenko,*** 92 F.3d 486 [7th Cir. 1996].  Although the guidelines may discourage a consideration of a defendant's remorse in those decisions about downward

departures, the district court may indulge in such considerations.

In *U.S. v. Moreland*, 437 F.3d 424 [4th Cir. 2006], the Court held that traditional departures remained important even after *Booker*. Therefore, it could be readily assumed that a defendant should avail herself of all the traditional departures in addition to, and not in lieu of *Booker*.[7] Even subsequent to *Booker* and the *2003 Amendments*, there still remains a flavor in relation to **5K2.0[3]**.

**Work Ethic**:

During her employment at TBW, it was not uncommon for Ms. Brown to work 50+ hour weeks. She was never paid for overtime while she was a designated hourly employee. Her dedication to work brought her attention to her superiors. She worked 27 hours straight on an emergency basis to have a loan servicing sale completed, predicated upon the mismanagement of others; doing so while she was on vacation. Her extensive work ethic and hours at the job allowed her to advance in the system, but also made TBW profitable and allowed it to grow. It was not uncommon for Ms. Brown to work weekends, even after her promotion and reception of the title, treasurer, her normal work week was 60 to 70 hours. In addition, she was "on call" 24 hours a day. She never was

---

[7] *U.S. v. Booker*, 543 U.S. 220 [2005].

21

able to utilize a personal or sick day nor was she afforded a vacation in four years.  She was well compensated for these efforts, but her job truly was 24/7 which included working yearly holidays, Christmas, Thanksgiving, etc.  Also, see **PSR, para.72-76.**

The probation interview and colloquy memorialized by the probation department in the **PSR, Pg. 15 para.7**, best exemplifies the actions and the motivating factors, therein:

> During an interview with the undersigned, the defendant expressed deep regret and remorse for her actions.  She advised Farkas repeatedly told her that she could fix the problem and could be part of the solution.  The defendant stated Farkas reassured her that the financial problems were going to be resolved.  She described Farkas as a bully, and stated he told her that the weight of the company and the jobs of the employees were on her shoulders. The defendant advised she was loyal to Farkas because of the employment and promotional opportunities he provided her. She expressed remorse for allowing herself to be used by Farkas and to go against her own moral code.  Defendant advised she was also told by Farkas that she had to continue in her activities in order to help Colonial Bank.

It should be noted that the overall pattern of the on-going TBW fraud, as documented by other participants and co-defendants [except Lee Farkas], was cut from this similar cloth. Unfortunately, once the dye was cast to usurp legal channels in order to assist TBW under the auspices of making it "healthy"

22

again and allowing for the replacing of the funds, the predicate actions were then set in stone.

The defendant's actual pecuniary gain, except for some sporadic *percs*, was limited to a healthy salary and bonuses.[8] The amount of would-be money that she received for her labors, whether fortuitous or illegal, were a result of her work ethic.[9] Even after TBW, Ms. Brown continued her efforts in obtaining an insurance license as a basis for future and on-going employment. **PSR P.19 para. 73.**  It should be noted that this was done even though she was aware of the fact that there was a forthcoming

---

[8] The actual contribution of growth and production that the company TBW was experiencing as far as loan closings and timely funding.  Ms. Brown was also afforded a $700,000.00 loan [mortgage] from TBW to purchase a new home which terminated in incompletion and foreclosure.  **PSR P.21 para.84]**

Ms. Brown's lifestyle was modest: she resided in a home purchased for $160,000.00 and drove a 2006 Camry.  The home is now in foreclosure.

[9]  While employment history is not ordinary relevant and departing from the guidelines, the Fifth Circuit held that the district court could properly consider a police chief's "unblemished record" as a police officer in departing downward in a civil right's case.  ***U.S. v. Harris***, 293 F.3d 863 [5th Cir. 2002]. Also see, **PSR Employment Record P.19.**

The Second Circuit upheld a downward departure based on the defendant's employment history, and the "remarkable" way in which the bribery offense was committed.  ***U.S. v. Jagmohan***, 909 F.2d 61 [2nd Cir. 1990]. Although counsel realizes that the case was considered more on lack of sophistication, the concept of work ethic remains and there is no specific prohibition applying of the latter to this set of circumstances.  In ***U.S. v. Tsosie***, 14 F.3d 1438,1442-43 [10th Cir. 1994], the Court held steady employment and economic support of family indicated defendant's conduct was aberration.

sentencing, wherein, she could realistically be subjected to a period of incarceration.

**Additional Consideration Factors:**

The sentencing guidelines are a strong myriad of numerical calculations that are directed at identifying specific general activity and attributing a coefficient, which in turn is to be adjusted by additional numerical coefficients, with the intended result to render a would-be justified sentence.

The defendant, as well as six others, have been charged in reference to the law violations associated with TBW, Colonial Bank, etc.  All but one, Lee Farkas, entered pleas.  All but one, Lee Farkas, accepted responsibility.  All but one, Lee Farkas, provided assistance to the government.

The issue becomes, the extent of that assistance and the Court's determination of same.  This issue [5K1.1]has been previously addressed and need not be specifically revisited at this time.

However, the sentencing scheme, that brought these seven people before the Court, was predicated upon the charging structure utilized by the government and predicated upon its choice and sole discretion as to what statute would be unveiled as to each of the respective defendants. **See Chart attached as Exhibit "A".**

Herein, Ms. Brown has been prosecuted under and pled to violations of Title 18 U.S.C. §1349, 1344, 1348 and 1343, which

imposes a maximum statutory sentence of 30 years of incarceration.  As referenced by the **Chart,** only one of the cooperating defendants, Catherine Kissick, was charged with a statute carrying that extensive exposure.[10]

The defendant has been enhanced six additional levels predicated upon a violation of 2B1.1[b][2][C] offense involving more than 250 victims [Colonial Bank investors].  Although the defendant agrees she qualifies for such an enhancement based on *numerical determinatives,* it should be taken into consideration the nature of the 250 victims.  The defendant's actions were not geared at 250 separate individuals who were sought out and individually victimized as a direct concern for the financial enhancement or betterment of the defendant.  Quite to the contrary, the loss sustained was not one of a "selfish" preying of the defendant upon individual investors or banking customers, but by performing fraudulent services.  The defendant's intentions, although clearly misguided, were to maintain TBW through the acts which resulted in bank, securities and wire fraud.  The defendant's actions were not specifically directed at defrauding individuals out of specific sums of money directly for her own personal gain **[see, PSR Pg.15 para.7].**  Although she does

---

[10]   The incarceration periods referenced in specific statutes become paramount in determining a sentence.  A maximum sentence of 30 years could in fact become a guideline sentence, as it has here, as compared to a statute charging a lessor term of years.

not condone her behavior and may have readily conjectured that "there's always a right way of doing something wrong", and, once again, she has acknowledged the wrongdoing; demonstrated remorse; and accepts responsibility. **PSR Pg.12 para. 35.**

## §5G1.1[a] Departure:

Desiree Brown's *recommended* sentencing guidelines references the statutory maximum 360 months [Level42]. However, a district court has discretion to depart downward when **§5G1.1[a]** renders the statutory maximum of the guideline sentence as it has when the guideline sentence is calculated without reference to **§5G1.1[a].** This section is simply the guidelines recognition that a court lacks authority to impose a sentence <u>exceeding</u> the statutory maximum. This section was not intended to transform the statutory maximum into a minimum sentence for which a court may not depart in appropriate circumstances. See, **U.S. v. Rodriguez**, 64 F.3d 638,642 [11th Cir. 1995]; accord, **U.S. v. Cook,** 938 F.2d 149,152 [9th Cir. 1991]; **U.S. v. Sayers**, 919 F.2d 1321,1324 [8th Cir. 1990]; **U.S. v. Martin**, 893 F.2d 73,76 [5th Cir. 1990].

In **U.S. v. Rodriguez**, the court considered "other circumstances where a downward departure may be warranted" referencing that when a sentencing to a statutory maximum under **§5G1.1[a]** would effectively negate a <u>3 level reduction</u> for acceptance of responsibility. Here, it is requested that the

Court consider the defendant's exceptional cooperation, as referenced throughout this Sentencing Memorandum and held in accord by the government and allow for the 3 level reduction relating to acceptance of responsibility in an extremely timely fashion.[11]  In accordance with *Rodriguez*, the defendant requests that the court allow for an additional 3 level downward departure in addition to, and not in lieu of, the other considerations sought forth, herein.

**Sentencing Recommendation:**

Counsel, on behalf of Desiree Brown, respectfully request that the Court initiate its evaluation of the matters before it and commence at a guideline level of **42 [360 months]** referencing **Criminal History Category 1**, and

That the Court allow for a 3 level reduction for the acceptance of responsibility under **5G1.1[a].**

That the Court allow for an additional 1 level reduction for extreme remorsefulness.

That the Court further allow for an additional reduction of 1 level relating to work ethic.

That the Court allow for an additional 2 level departure for assistance outside of **5K1.1** and in accordance with the considerations relating to **5K2.0.**

---

[11] The defendant cooperated with the government from its initial contact and continued that cooperation.  The defendant allowed for charges to be brought under a criminal information as opposed to a formal indictment.

That the Court take into consideration the **5K1.1** efforts of Desiree Brown predicated upon the recommendations from the government **and** the related historical efforts referenced by the defendant, herein, and afford her a 10 level downward departure.

It is the recommendation of counsel that the Court consider sentencing the defendant, Desiree Brown, at a guideline range of up to Offense Level 25 [57-71 months], at Criminal History 1, followed by the appropriate terms of supervised release.

**Self Surrender**: Desiree Brown requests the Court to allow her to self surrender at a designated institution.  In support of the request, the defendant would reference the Court to the fact that she has been on pre-trial release since her consent to the entry of a criminal complaint and plea, thereon **[February 24, 2011]**.  Additionally, prior thereto, she was afforded notice and had knowledge that she was a possible target of a criminal investigation **[on August 3, 2009]**.  Ms. Brown could have readily chosen to attempt the avoidance of criminal prosecution and departed. She chose not to do so and remained.  She initiated cooperation with the government and remained active, retaining counsel throughout the proceedings and voluntarily appears before the Court, as she did on February 24, 2011 to address the matters.  That the defendant is obviously not a flight risk nor is she a threat to the community.

RESPECTFULLY SUBMITTED this 2nd day of June, 2011.

THOMAS D. HUGHES, IV, ESQUIRE    JACK R. MARO, ESQUIRE
Virginia State Bar No. 16148      Florida Bar No. 174775
941 Sunnybank Road              Post Office Box 3868
Reedville, VA 22539             Ocala, FL 34478
[804] 453-9204                 [352] 620-0797
Tomhughes@kaballero.com      Ocalaw@Ocalaw.cfcoxmail.com
Local Counsel for Defendant     Attorney for Defendant

/s/ Thomas D. Hughes, IV       /s/ Jack R. Maro
_____   _____
THOMAS D. HUGHES, IV, ESQUIRE    JACK R. MARO, ESQUIRE

_____

**EXHIBIT "A"**

## CHARGING STRUCTURE

| | | |
|---|---|---|
| TERESA KELLY | Ct. 1: Conspiracy to Commit Bank, Wire and Securities Fraud | 5 years imprisonment 3 years supervised release |
| SEAN RAGLAND | Ct. 1: Conspiracy to Commit Bank and Wire Fraud | 5 years imprisonment 3 years supervised release. |
| RAYMOND BOWMAN | Ct. 1: Conspiracy to Commit Bank, Wire and Securities Fraud Ct. 2: False Statements | 5 years for each count 3 years  supervised release |
| PAUL ALLEN | Ct. 1: Conspiracy to Commit Bank Wire and Securities Fraud Fraud;  Ct. 2: False Statements | 5 years for each count 3 years supervised release. |
| CATHERINE KISSICK | Ct. 1: Conspiracy to Commit Bank, Wire and Securities Fraud | 30 years imprisonment 3 years supervised release. |
| DESIREE BROWN | Ct. 1: Conspiracy to Commit Bank, Wire and Securities Fraud | 30 years imprisonment 5 years supervised release |
| LEE FARKAS | Ct. 1: Conspiracy to Commit Bank Fraud, Mail Fraud Ct. 2 thru 7: Bank Fraud Ct. 8 thru 13: Wire Fraud Ct. 14 thru 16: Securities Fraud | 30 years imprisonment 5 years imprisonment 5 years imprisonment 5 years imprisonment Supervised release |