IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 1:11CR84 |
| v. ) | |
| ) | Honorable Leonie M. Brinkema |
| DESIREE BROWN, ) | |
| ) | Sentencing Date: June 10, 2011 |
| Defendant. ) | |

**POSITION OF THE UNITED STATES
WITH RESPECT TO SENTENCING**

The United States of America, through its attorneys, Denis J. McInerney, Chief, Fraud Section of the Criminal Division of the United States Department of Justice, Patrick F. Stokes, Deputy Chief, and Robert A. Zink, Trial Attorney, and Neil H. MacBride, United States Attorney for the Eastern District of Virginia, Charles F. Connolly and Paul J. Nathanson, Assistant United States Attorneys, in accord with 18 U.S.C. § 3553(a) and the United States Sentencing Commission, Guidelines Manual ("Guidelines" or "U.S.S.G.") § 6A1.2 (Nov. 2010), files this Position of the United States With Respect to Sentencing of the defendant, Desiree Brown. For the reasons discussed herein, the government requests that the Court assess a sentence of 20 years and reduce that sentence by 60% based on the defendant's substantial assistance to the government's investigation for a final sentence of eight years' (96 months') incarceration in this case.

*Background*[1]

Lee Farkas was the chairman and principal owner of Taylor, Bean & Whitaker Mortgage Corp. (TBW), a mortgage company based in Ocala Florida. Colonial Bank was one of the 25 largest depository banks in the country and was based in Montgomery, Alabama. Colonial's Mortgage Warehouse Lending Division ("MWLD") provided financing to mortgage origination companies, including TBW. From approximately 2002 through August 2009, Farkas and numerous co-conspirators, including Desiree Brown, defrauded three banks of more than $2.9 billion, misled shareholders of Colonial BancGroup, Inc., and attempted to fraudulently obtain more than $500 million from the government's TARP program.

The conspiracy consisted of five separate schemes:

1. **Overdraft / sweeping scheme:** Beginning in 2002, prior to Brown's involvement in the conspiracy, Farkas and other co-conspirators engaged in a "sweeping" scheme to hide overdrafts in TBW bank accounts held at Colonial Bank. TBW ran large overdrafts in its Master Account to cover its operating expenses. To cover up the overdrafts, conspirators "swept" funds on a daily basis into this account from the Investor Funding Account, a Colonial Bank-controlled account. The sweeping scheme, which grew to approximately $140 million, continued until approximately December 2003. In addition to Farkas, other co-conspirators participating in the sweeping scheme included Ray Bowman, the president of TBW, Cathie Kissick, head of the MWLD at Colonial Bank, and Teresa Kelly, an MWLD operations supervisor.

2. **Plan B on COLB.** In December 2003, Farkas and Kissick implemented "Plan B," a new phase of the scheme in which they caused the deficit covered up by the sweeping scheme to be moved to the COLB facility. While Plan B was initially supposed to be a one-time event, the

---

[1] In light of this Court's familiarity with the facts of this case, the Government includes only a brief overview and recitation of the key facts.

conspirators continued to engage in Plan B transactions for years.  Under Plan B, conspirators caused TBW to engage in fake sales of mortgage assets to Colonial Bank.  TBW pretended to sell mortgage loans to Colonial Bank, and the bank advanced TBW money for the loans.  In fact, the mortgage loans either did not exist or had already been sold to other banks or investors.  By mid-2005, Colonial Bank held approximately $250 million in Plan B loans on its books.  In addition to Farkas and Kissick, Bowman and Kelly also participated in Plan B.  Brown's involvement in the conspiracy began with Plan B.  She learned of the scheme from Farkas, and she eventually took over the day-to-day administration for TBW of tracking the age of Plan B loans, replacing aged Plan B loans with new data, and keeping Farkas informed when TBW was short cash and needed more Plan B funding from Colonial Bank.

    3.  **Plan B on AOT.**  Plan B on COLB grew to approximately $250 million and, because of the number of loans involved, became difficult for the conspirators to administer.  In 2005 the conspirators moved Plan B from COLB to Colonial's Assignment of Trade (AOT) facility.  The AOT facility was intended for the purchase of pools of loans that TBW was in the process of selling or securitizing.  Under this new version of Plan B, the conspirators engaged in fake sales of pools of loans to Colonial Bank, and in return TBW received over $1.3 billion from Colonial Bank from mid-2005 through mid-2008.  The Plan B pools of loans that TBW sold Colonial Bank consisted of nothing more than data for pools of loans that TBW had already sold to other investors.  As such, the Plan B data were worthless to Colonial Bank.  TBW paid down some of the Plan B balance on AOT over time, and by August 2009 Colonial Bank held approximately $500 million worth of worthless Plan B pools on the AOT facility.  Brown continued her role with Plan B when the scheme migrated to the AOT facility.  Other co-conspirators involved with Plan B on AOT included Farkas, Kissick, and Kelly.  As a result of Plan B, Colonial BancGroup,

the public holding company for the bank, significantly overstated the mortgage assets held by the MWLD in BancGroup's public financial filings, including its annual reports (Forms 10-K) and quarterly reports (Forms 10-Q).

    4. **Ocala Funding ("OF").** OF was a standalone subsidiary of TBW. It was designed to provide low-cost funding to TBW for additional mortgage loan originations. It was also set up to be bankruptcy remote. OF issued commercial paper (corporate IOUs) to investors in return for cash. OF would then use the cash to fund mortgage loans at TBW. OF was required to have at all times more assets (cash + loans) than liabilities (the commercial paper). And, OF cash could only be used for OF purposes. When TBW ceased operations in August 2009, there were two investors in OF: Deutsche Bank ("DB") and BNP Paribas, who owned a combined $1.75 billion in commercial paper. Farkas and Brown caused nearly all of the assets in OF to be stripped out and used to pay other TBW expenses, including mandatory servicing advances to investors in mortgage bonds TBW had sold. To cover up the missing assets, Brown and other co-conspirators caused OF loans already sold to Freddie Mac to continue to appear as collateral at Colonial Bank and OF. As a result, Colonial Bank believed it owned $900 million in loans that had already been sold to Freddie Mac, and DB and BNP Paribas, as the investors in OF, believed they had approximately $1.67 billion in loan collateral backing their supposedly asset-backed commercial paper when in fact there was only collateral of roughly $160 million. Paul Allen, TBW's CEO, and Sean Ragland, a TBW financial analyst, facilitated the conspiracy by causing false collateral reports to be sent to DB and BNP Paribas as well as the custodian for OF, LaSalle Bank (purchased by Bank of America in 2007), that inflated by hundreds of millions of dollars the actual value of the collateral backing the commercial paper. Kissick and Kelly were not involved in the OF phase of the fraud scheme, and Colonial Bank was a victim of this fraud.

5.  **Capital Raise.**  In the fall of 2008, Colonial BancGroup, Colonial Bank's holding company, applied for more than $550 million of TARP funds.  Colonial BancGroup was approved for $553 million contingent upon its raising an additional $300 million in private capital.  In early 2009, TBW undertook to lead the capital raise.  TBW said it would invest $150 million itself and would find two private equity investors to invest $50 million each.  Colonial BancGroup undertook to raise the remaining $50 million from other companies with which it did business.  Ultimately, Colonial BancGroup announced on March 31, 2009, that it had met its contingency.  That was false; TBW had falsely represented the participation of the two $50 million private equity investors and misrepresented where the 10% deposit for TBW itself had come from.  Moreover, Colonial BancGroup's TARP application, which incorporated the bank's financial statements, was materially false in that the fraud scheme caused the bank to significantly overstate the value of mortgage assets on its books.  Farkas and Allen were involved in falsely representing the participation of the two $50 million private equity investors.  Brown assisted Farkas in obtaining a $25 million deposit on behalf of TBW and the two equity investors by taking the money from OF.  While Kissick was not aware of Farkas's misrepresentations regarding the equity investors, she knew that Colonial BancGroup's TARP application relied upon false bank financial data.

*The Appropriate Guidelines Range*

The Probation Officer has calculated the defendant's offense level to be substantially more than 43.  In particular, the Probation Officer includes a base offense level of 7, a 30-level adjustment for a loss of more than $400 million, a 6-level adjustment for the number of victims, an 4-level adjustment for substantially jeopardizing the safety and soundness of a financial institution (reduced by 2 levels pursuant to U.S.S.G. § 2B1.1(b)(14)(C) for a combined increase

with the victim-adjustment of 8 levels), a 2-level adjustment for sophisticated means, a 3-level enhancement for her role in the offense, and a 3-level reduction for acceptance of responsibility. Brown stipulated to these adjustments and enhancements in her plea agreement. This results in a Guidelines range of life. As Brown pleaded guilty to a one-count information charging her with conspiracy under 18 U.S.C. § 1349, her maximum possible period of incarceration is 30 years.

*Application of the Guidelines*

I. **Applicable Legal Standards**

As this Court is aware, following the Supreme Court's decision in *United States v. Booker*, the Guidelines are now advisory. *United States v. Booker*, 543 U.S. 220, 261 (2005). As such, "[i]n the wake of *Booker* . . . the discretion of the sentencing court is no longer bound by the range prescribed by the guidelines." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). The Supreme Court subsequently clarified that this means that the sentencing court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007), *quoted in Nelson v. United States*, --- US ----, 129 S.Ct. 890, 892 (2009). Nevertheless, "sentencing courts are not left with unguided and unbounded sentencing discretion." *United States v. Green*, 436 F.3d 449, 455 (4th Cir. 2006). Instead, at sentencing a court "must first calculate the Guidelines range." *United States v. Nelson,* 129 S. Ct. at 891; *see also United States v. Hughes*, 401 F.3d at 546 (holding that a sentencing court is still required to 'consult [the] Guidelines and take them into account when sentencing'") (*quoting United States v. Booker*, 542 U.S. at 264). After appropriately calculating the Guidelines, a sentencing court must then consider the Guidelines range, as well as the sentencing factors set forth in 18 U.S.C. § 3553(a), and determine a sentence that is appropriate for the individual defendant. *United States v. Nelson,* 129 S. Ct. at 891-92, *see also United States v. Hughes,* 401 F.3d at 546.

## II.     Sentencing Recommendations

Brown's role in the conspiracy was substantial.  She was fully aware that her actions were fraudulent, she worked closely with Farkas in carrying out the fraud scheme, and she administered the day-to-day activities of the fraud on behalf of Farkas and TBW.  Based on the Guidelines calculation and the statutory maximum, Brown is facing a potential 30-year sentence.  However, there are a number of factors, more fully discussed below, that lead the government to recommend here that the Court begin its determination of Brown's sentence below the Guidelines range and below the statutory maximum.  Brown, who had a high-school degree and no formal financial training, was promoted by Farkas to treasurer of the largest private mortgage lending company in the country (conducting approximately $20 billion in mortgage sales per year) in large part, the evidence shows, because he could control her.  As Brown testified at trial, she was intensely loyal to Farkas precisely because of the job opportunities he gave her.  Although Brown handled many day-to-day aspects of the fraud scheme, she took direction from Farkas.  That is, she consulted with him on the illegal financial transactions and sought his permission to fraudulently divert funds from other banks to TBW to help cover TBW expenses.  While Brown was well-compensated for her position as treasurer, earning more than $500,000 per year by 2008, it does not appear that she (or any other co-conspirators except Farkas) personally profited from the fraudulent transactions.  Farkas, on the other hand, was the principal beneficiary of the fraud scheme, with his TBW stock rising to more than $170 million in value at one point, receiving salary and bonus payments of as much as $2 to $3 million annually, and personally stealing more than $30 million from TBW and Colonial Bank.  The government believes that an appropriate starting point for determining Brown's sentence, before a reduction pursuant to U.S.S.G. § 5K1.1, is 20 years incarceration.  The factors warranting this departure

from the Guidelines are discussed more fully below. As recommended in the § 5K1.1 motion, the government is recommending a further reduction of 60% based on Brown's substantial assistance. Thus, the government recommends a final sentence of eight years' (96 months') incarceration.

**III.     The 18 U.S.C. § 3553(a) Factors**

In imposing a sentence in this case, the Court must look to 18 U.S.C. § 3553(a). This section requires that the Court consider, among other things, (a) the nature and circumstance of the offense and the history and characteristics of Defendants; and (b) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a). As noted above, the government believes the § 3553(a) factors warrant an initial sentence of 20 years before the Court applies a reduction for substantial assistance.

  **A.**  *Nature and Circumstances of the Offense and History and Characteristics of the Defendant.*

One key factor that the Court must consider is the nature and circumstances of the offense and the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(1). The defendant in this case participated in a massive fraud scheme, one of the longest-running and largest bank-fraud operations in history. While the scheme spanned eight years, the defendant's participation started in December 2003 and lasted until the collapse of the scheme in August 2009. As the treasurer for TBW, Brown helped Farkas steal hundreds of millions of dollars from Colonial Bank through Plan B and approximately $2.4 billion through OF and Colonial Bank, all in order to cover TBW's operating expenses. Brown took direction from Farkas, but once she received instructions she typically executed transactions or managed others in her department in carrying out fraud. For example, after "selling" Colonial Bank Plan B hundreds of millions of

dollars worth of fake pools of loans, Brown and her subordinates worked with Kissick and Kelly to "recycle" the aged pools of loans by replacing them with new fake pools of loans.  In this ongoing process, Brown and her subordinates prepared bogus documents to give the appearance that the old pools were being replaced by new pools in legitimate arms-length transactions.

As a result of her actions, Brown helped facilitate the theft of more than $2.9 billion from Colonial Bank, Deutsche Bank, and BNP Paribas.  She took steps to deceive Colonial's management, Colonial's and TBW's auditors, and bank regulators.  Her actions also defrauded shareholders in Colonial BancGroup, Colonial Bank's public holding company.  The scheme lasted years, and Brown was essential to its continued functioning.  Over time, she became Farkas's trusted lieutenant in executing the fraud.

Although Brown, TBW's treasurer, had limited financial experience and formal education, she had substantial hands-on experience through management positions at TBW. Farkas promoted her through the ranks to treasurer, and she worked closely with him, as demonstrated by trial testimony and email evidence, to track TBW's overdrafts, expenses, and mounting deficits at Colonial Bank and OF.  Brown fully understood that she and her co-conspirators were defrauding others, yet she continued to participate in the scheme for years. Brown was well-compensated for her position at TBW, earning more than $500,000 per year by 2008.  The evidence shows that Brown did not receive direct compensation from the fraud scheme.  Brown's substantial role in one of the largest fraud schemes in recent history warrants a substantial sentence, and we believe imposing an initial sentence of 20 years before applying a reduction for substantial assistance appropriately reflects the nature and circumstances of the crime and her history and characteristics.

**B.** *Seriousness of the Offense, Respect for the Law, Just Punishment for the Offense, and Deterrence to Criminal Conduct*

The Court must also consider the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence. *See* 18 U.S.C. § 3553(a)(2). Fraud cases are serious offenses, and those who commit such offenses deserve particularly severe sentences because the nature and complexity of the fraud they commit requires such significant time and resources to detect, prosecute, and deter. A 20-year initial sentence would appropriately reflect the seriousness of the offense and provide just punishment in this case.

Imposing an initial sentence of 20 years would also afford both specific and general deterrence, as required by 18 U.S.C. § 3553(a)(2)(B). Brown knowingly and intentionally facilitated a massive fraud scheme for more than five years, contributing to the collapse of Colonial Bank and the looting of OF. While Brown's cooperation with the government's investigation suggests that she has fully accepted responsibility for her actions, her lengthy participation in the scheme warrants a sentence that will impress upon her, as well as others, that such conduct will not be treated lightly or tolerated.

General deterrence alone can justify lengthy sentences, even where such long sentences are not necessary to achieve specific deterrence. *United States v. Sagendorf*, 445 F.3d 515, 518 (1st Cir. 2006). Fraud offenses are serious, and a lengthy sentence will ensure that would-be violators do not receive the message that the gain to be derived from defrauding financial institutions, shareholders, or the government outweighs the potential consequences. Here, where the defendant facilitated a massive fraud scheme over a series of years, a significant sentence is necessary to send a strong deterrence message to others.

If the sentence truly is to "reflect the seriousness of the offense," "promote respect for the law," "provide just punishment for the offense," and "afford adequate deterrence to criminal conduct," it must be substantial. *See* 18 U.S.C. § 3553(a)(2). This is particularly true here in light of the size of the fraud scheme, its duration, and the substantial damage it caused. An insubstantial sentence would signal that the type of long-standing, egregious fraud in which the defendant engaged is somehow deserving of special consideration from the Court. Moreover, if individuals who defraud financial institutions and corporate shareholders and attempt to defraud the United States believe that the penalty for doing so is trivial, then no disincentive exists to prevent those who are best-equipped with the means and ability to commit fraud from doing so. An initial sentence of 20 years before applying a reduction for substantial assistance is necessary to satisfy the requirements of § 3553(a)(2).

### C. *The Need to Avoid Unwarranted Sentencing Disparities*

The government's recommendation that the Court impose an initial sentence of 20 years will avoid any unwarranted sentencing disparities between Brown and her co-defendants who pleaded guilty and testified against Farkas.[2] Brown faces a longer initial sentence than most of these co-conspirators, except Kissick, and her role in the fraud scheme warrants such treatment. As the Court is aware from the evidence admitted at trial, Brown held a high-level position at TBW, fully understood the scope and nature of the full fraud scheme, and worked closely with Farkas to carry the scheme to fruition. Unlike Allen, Bowman, and Ragland, TBW employees who had limited roles in the scheme, Brown participated in all aspects of the fraud. While Brown's role often mirrored that of Teresa Kelly's, a lower-level manager at Colonial Bank, Kelly's role was limited to Plan B, whereas Brown was instrumental in carrying out the day-to-

---

[2] The government has included a chart in its under-seal motion for a reduction in sentence that contains its sentencing recommendations, including suggested reductions for substantial assistance, for each of the cooperating co-defendants.

day functioning of and advising Farkas on the OF component of the fraud scheme as well, which caused losses to victims of more than $2.4 billion. The government intends to recommend the same initial sentence for Kissick as for Brown. Kissick led the Plan B fraud scheme for Colonial Bank, and, unlike, Brown, she was a decision-maker in the scheme. However, in light of Brown's high-level position, substantial involvement in the scheme, and participation in the OF aspect of the scheme, the government submits that the § 3553(a) factors warrant the same initial sentence for Brown and Kissick.

The government intends to recommend a substantially higher sentence for Farkas. The government respectfully submits that an initial sentence for Brown of 20 years (and the recommended initial sentences for the other co-defendants) will not create an unwarranted disparity with a lengthy sentence imposed on Farkas because of the substantially different roles each played in the scheme and the different postures of their cases. Farkas led the fraud scheme, in part, by manipulating his co-defendants and limiting the flow of information to them. He was the overwhelming beneficiary of the scheme, he stood to gain the most as the owner of TBW, and he lived a lavish lifestyle that none of his co-conspirators shared. Brown's and her cooperating co-defendants' cases also are in a very different posture than Farkas's. They each pleaded guilty pre-indictment, fully accepted responsibility, have shown remorse for their actions, and cooperated substantially with the government's investigation. Thus, for Brown, an initial sentence of 20 years will not create an unwarranted disparity with a much lengthier sentence imposed on Farkas.

*Restitution*

The government is still in the process of identifying victims and their loss amounts. The amount of potential restitution in this case is enormous, with some defendants potentially facing

restitution orders of up to $2.9 billion. While it is unlikely that the victims will recover the full amount from the defendants, the government needs additional time to identify victims and the amounts they are owed to ensure they are able to recover ratably from any restitution payments made by Brown (or the other defendants). Therefore, after consultation with defense counsel and pursuant to 18 U.S.C. § 3664(d)(5), the government respectfully moves the Court to defer the entry of the restitution order until after the Farkas sentencing. In particular, the government requests a date approximately one week after the Farkas sentencing to submit to the Court a proposed restitution order for Brown (as well as all other defendants) that reflects all of the victims identified to date. This will ensure that late-identified victims and changes to loss figures based on additional review are consistently reflected in each restitution order.

## *Conclusion*

In accordance with the foregoing and for the reasons stated herein, the United States respectfully requests that the Court impose an initial sentence of 20 years' incarceration and then, for the reasons set forth in the government's substantial assistance motion, reduce that sentence by 60% for a final sentence of eight years' (96 months') incarceration.

        Respectfully submitted,

        Neil H. MacBride
        United States Attorney

By:        _____/s/_____
        Charles F. Connolly
        Paul J. Nathanson
        Assistant United States Attorney
        Eastern District of Virginia
        U.S. Attorney's Office
        2100 Jamieson Avenue
        Alexandria, VA 22314
        Ph: 703.299.3700
        Fax: 703.299.3981
        Charles.Connolly@usdoj.gov


        Denis J. McInerney
        United States Department of Justice
        Chief, Criminal Division, Fraud Section

By:        _____/s/_____
        Patrick F. Stokes
         Deputy Chief
        Robert A. Zink
         Trial Attorney
        U.S. Department of Justice
        1400 New York Avenue, NW
        Washington, DC 20005
        Ph: 202.305.4232
        Fax: 202.514.7021
        Patrick.stokes2@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on the 4th day of June, 2011, I filed electronically the foregoing Position of the United States with Respect to Sentencing using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Thomas D. Hughes IV
941 Sunnybank Road
Reedville, VA 22539
804-453-9204
tomhughes@kabellero.com

I have also sent a copy of the filing to the following:

Jack R. Maro
P.O. Box 3868
Ocala, FL 34478
352-620-0797
ocalaw@ocalaw.cfcoxmail.com

Karen Moran
Senior U.S. Probation Officer
Karen_Moran@vaep.uscourts.gov

                                                         /s/
Charles F. Connolly
Assistant United States Attorney
U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Phone: (703) 299-3771
Fax: (703) 299-3981
Email: Charles.Connolly@usdoj.gov